UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CAROLYN FLOYD,

                Plaintiff,

v.                                              Case No.  5:05-cv-233-Oc-GRJ

JO ANNE B. BARNHART, Commissioner of
Social Security,

                Defendant.
_____/

## ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for Social Security Disability Insurance ("SSDI") and Supplemental Social Security Income ("SSI") benefits.  (Doc. 1.)  The Commissioner has answered (Doc. 3.) and both parties have filed briefs outlining their respective positions.  (Docs. 9 & 10.)  For the reasons discussed below, the Court finds that the Commissioner's decision is due to be **REVERSED** and **REMANDED** under sentence four of 42 U.S.C. §405(g).

## I. PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on June 27, 2003, alleging disability beginning December 2, 2002. (R.59-60.) Plaintiff's application was denied initially (R.55-56), and upon reconsideration. (R.52-53.)  Thereafter, Plaintiff timely pursued her administrative remedies available before the Commissioner and requested a hearing before an Administrative Law Judge ("ALJ").  (R.51.)  The ALJ conducted the Plaintiff's administrative hearing on July 7, 2004 (R.262-279) and issued

a decision unfavorable to the Plaintiff on August 6, 2004. (R.14-20.)  The Appeals Council denied the Plaintiff's request for review on March 17, 2005. (R.4-6.)  Plaintiff then timely appealed to this Court.

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]   The law

---

[1] See 42 U.S.C. § 405(g).

[2] See Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] See Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] See Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] See Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making the Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

---

[6] See 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] See 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] See 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] See 20 C.F.R. § 404.1520(b).

[10] See 20 C.F.R. § 404.1520(c).

[11] See 20 C.F.R. § 404.1520(d).

[12] See 20 C.F.R. § 404.1520(e).

[13] See 20 C.F.R. § 404.1520(f).

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a

---

[14] See Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See Also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] See Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[16] See Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

[17] See Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[18] See Walker at 1003.

[19] See Wolfe at 1077-78.

vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

### III. SUMMARY OF THE RECORD EVIDENCE

Plaintiff was born on June 4, 1959 and was forty-five (45) years old when the ALJ issued his decision. (R.11, 264.) Plaintiff graduated from high school (R.265) and worked as a certified nursing assistant from 1983 until 2002. (R.60.) Plaintiff contends that she has been unable to work since December 2002, when she began to experience chest pains at work. (R.265.)

In early 2001, Plaintiff injured herself when she fell in the bathtub. (R.198.) Soon after the fall, Plaintiff developed pain in the hip, low back, groin, legs, and buttocks. (R.198.) Dr. Ice treated Plaintiff for resulting pain after her injury. (R.197-221.) An x-ray performed on September 6, 2001 showed scoliotic deformity of the lumbar spine and minimal degenerative spondylosis. (R.221.)

Dr. Ice continued treating Plaintiff from January 2002 through June 2002. (R.193-219.) An MRI performed on January 14, 2002 revealed mild levoscoliosis and minimal lower lumbar degenerative facet joint hypertrophic osteoarthritic changes. (R.219.) She was also diagnosed with vertigo and mild sinusitis. (R.194.)

On October 15, 2002, Dr. Sami, a neurologist, examined Plaintiff. (R.169-170.) This examination revealed a decreased sensation in the first three digits of the right

---

[20] See id.

[21] See Doughty at 1278 n.2.

hand, 5/5 strength throughout, and normal coordination. (R.170.)

On October 31, 2002, Dr. Sami performed an EMG and nerve connection study on Plaintiff that revealed evidence of carpal tunnel syndrome in her right hand. (R.167.)

In December 2002, Plaintiff was admitted to Citrus Hospital for chest pains and palpitations. (R.130-155.) An electrocardiogram, conducted at the hospital, revealed a normal electrocardiogram, and a cardiac catheterization showed normal left ventricular function and normal arteries. (R.133.) However, Plaintiff was diagnosed with unstable angina (R.133.) and was discharged from the hospital with a diagnosis of atypical chest pain and hyperlipidemia. (R.130.)

On December 17, 2002, Dr. Ice examined Plaintiff for a follow-up because of chest pains. (R.188.) Dr. Ice diagnosed Plaintiff with polyarthralgias and costochondritis. On December 23, 2002, blood work performed on Plaintiff showed that the RA latex was elevated at 120.0 and the sedimentation rate was elevated at 48. (R.206.)

On January 26, 2003, Dr. Torralba, a rheumatologist referred by Dr. Ice, examined Plaintiff for multiple joint pain. He diagnosed her with seropositive rheumatoid arthritis with active polyarticular symmetrical involvement of the small joints, fibromyalgia, hypertension, and hyperlipidemia. (R.159-160.)

On March 3, 2003, Dr. Sami examined Plaintiff again and diagnosed her with muscle tension headache and cervicalgia, right carpal tunnel syndrome with right arm pain, chronic low back pain, arthritis, obesity, hypertension, GERD, and advised her to restart the Neurotonin, which she had discontinued using a month earlier. (R.157.)

On May 7, 2003, Dr. Ice examined Plaintiff and diagnosed her with rheumatoid

arthritis, fibromyalgia, and borderline diabetes mellitus. Dr. Ice also instructed Plainitff to began taking Prednisone. (R.186-187.)

On September 5, 2003, Dr. Ice completed an assessment form regarding Plaintiff's condition. Dr. Ice described Ms. Floyd's loss of motion and/or deformity of her joints in her wrists and hands as being most affected, with the left less than the right. (R.182.) Dr. Ice noted that the Plaintiff had difficulty with multiple activities of daily living, including difficulty with such tasks as buttoning, zipping, opening containers and turning doorknobs. (Id.) Plaintiff's grip strength was two plus on the right and one plus on the left. (R.182.)

The Plaintiff returned to Dr. Ice on January 24, 2004, and stated that she had been doing "pretty good" since starting Prednisone. (R.242.) The Plaintiff also reported that she had reduced her activities due to dyspnea, but she was still taking regular walks for exercise. (R.242.)

## IV.  DISCUSSION

### A.   The ALJ Failed To Articulate Adequate Reasons For Discrediting The Opinion Of Plaintiff's Treating Physician

It is well-established that substantial or considerable weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless "good cause" is shown to the contrary.[22] If a treating physician's opinion regarding the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial

---

[22] Crawford v. Commissioner of Social Security, 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records."). See also Edwards, 937 F.2d at 583-584; Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

7


evidence in the record, the ALJ must give it controlling weight.[23]

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.[24] Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[25]

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical issues at issue; and (6) other factors which tend to support or contradict the opinion.[26] However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.[27]

Upon a review of the ALJ's decision, as well as an examination of the medical evidence in the record, the Court concludes that the ALJ failed to consider properly the opinion of Dr. Ice as a treating physician. Dr. Ice treated the Plaintiff from 2001 through

---

[23] 20 C.F.R. § 404.1527(d)(2).

[24] Edwards, 937 F.2d at 584 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

[25] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); see also Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir.1987).

[26] 20 C.F.R. § 404.1527(d).

[27] Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); see also 20 C.F.R. § 404.1527(d)(2).

at least March 2004 and during that time served as Plaintiff's primary care physician. Despite Dr. Ice's role as her primary treating physician, the ALJ did not articulate any reasons for discounting Dr. Ice's September 2003 assessment in which Dr. Ice concluded that Plaintiff had difficulty with multiple activities of daily living, limited anterior and posterior movement, and poor fine dexterity due to stiffness in her fingers.  Rather than according appropriate weight to the opinion of Dr. Ice, the ALJ instead improperly credited the opinion of the State Agency physicians, regarding Plaintiff's functional limitations.

The ALJ explicitly stated that he "accorded great weight to the State Agency opinion" in determining the Plaintiff's functional limitations. (R.17.)  However, the ALJ failed to articulate any reasons for not crediting Dr. Ice's opinion that the Plaintiff suffered from poor fine dexterity and had difficulty with multiple activities of daily living. Instead of crediting these limitations, the ALJ improperly found that the Plaintiff had no manipulative limitations.

Moreover, in addition to the ALJ's failure to articulate explicit reasons for discrediting the opinion of Dr. Ice, the evidence discussed by the ALJ as support of his implicit conclusion to ignore the findings of Dr. Ice are unsupported by the record.

For example, when discounting the Plaintiff's subjective complaints of pain, the ALJ noted that Plaintiff told Dr. Sami in March 2003 that she had stopped taking Neurontin. Although Plaintiff had been prescribed Neurontin to deal with pain there is no evidence that the Neurontin was prescribed to address the Plaintiff's rheumatoid arthritis in her wrists and hands. And the record discloses that the Plaintiff stopped taking Neurontin because it caused increased edema (swelling), which resulted in the referral

9

to the rhematologist. Therefore, there is no evidence that taking Neurontin would have eliminated Plaintiff's pain from arthritis and, accordingly, the evidence relied upon by the ALJ does not support a conclusion that medication would be sufficient to address the joint pain in Plaintiff's arms, hands, and wrists that was diagnosed by Dr. Ice.

Additionally, the ALJ's reliance upon one comment in Dr. Ice's progress notes as support for the ALJ's conclusion that the Plaintiff's complaints were "beyond what would reasonably be expected in terms of intensity, duration, or frequency" (R.17) is not a sufficient reason to ignore the other findings of Dr. Ice. The ALJ noted that Dr. Ice reported in his January 2004 progress note that Plaintiff was doing "pretty good" since getting back on Prednisone. While Dr. Ice's note does reflect that Prednisone was beneficial to Plaintiff's condition, the note is silent with regard to whether the Plaintiff was continuing to have problems with her hands, fingers and wrists and thus fails to address the issue of whether the Prednisone had any effect with regard to Plaintiff's manipulative limitations. This fact is underscored by Plaintiff's own testimony that while she was taking Prednisone she still continued to have difficulties with her hands and wrists. Thus, there was evidence of record that even with the medication, Plaintiff still suffered from manipulative limitations. Accordingly, any implication by the ALJ that Dr. Ice's opinion that Plaintiff had manipulative limitations could be ignored because Plaintiff had regained her manipulative abilities through the use of Prednisone is not supported by the record.

Lastly, the ALJ's reliance upon the fact that Plaintiff testified she walks for exercise does not support his conclusion that Plaintiff is capable of light work. Whether the Plaintiff walks for exercise is not a basis for assuming that she can perform the

sitting and standing requirements for light work. Moreover, there is no evidence of how long or even how frequently the Plaintiff walked for exercise. And even assuming Plaintiff is able to walk for exercise, this fact has no relevance to Dr. Ice's opinion that Plaintiff had manipulative limitations.

In sum, Dr. Ice's September 5, 2003 opinion that Plaintiff had difficulty with multiple activities of daily living, limited anterior and posterior movement, and poor fine dexterity due to stiffness in her fingers was entitled to substantial weight because of Dr. Ice's status as Plaintiff's primary care treating physician. Because the ALJ failed to articulate specific reasons supported by substantial evidence for his decision to discount the opinions of Dr. Ice (or even to articulate any reasons) this matter is due to be remanded to the Commissioner for proper consideration of Dr. Ice's opinions as a treating physician. On remand, the Commissioner should give substantial or considerable weight to Dr. Ice's opinions, or in the event the ALJ chooses to reject Dr. Ice's opinions, the ALJ must articulate specific reasons based on substantial evidence for giving lesser weight to his opinions, in accordance with the laws of the Eleventh Circuit.

### B.   On Remand The ALJ Should Obtain Vocational Expert Testimony To The Extent It Is Determined That Plaintiff Has Non-Exertional Limitations

The ALJ's error at the fourth step also affected the ALJ's findings at the fifth step. Based upon his RFC finding, the ALJ determined that Plaintiff could not perform her past relevant work. Thus, the burden of proof shifted to the Commissioner to establish that the Plaintiff could perform other work that exists in the national economy.[28] The

---

[28] See Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).

burden of showing by substantial evidence that a person who can no longer perform her former job can engage in other substantial gainful activity is in almost all cases satisfied only through the use of vocational expert testimony.[29]  It is only when the claimant clearly can perform unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.[30]

In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.[31] This burden may sometimes be met through exclusive reliance on the "grids" when each variable on the appropriate grid accurately describes the claimant's situation.[32] However, exclusive reliance on the grids is not appropriate either when the claimant is unable to perform a full range of work at a given functional level or when a claimant has non-exertional impairments that significantly limit basic work skills.[33]

Here, the ALJ relied solely upon the grids and did not consult a vocational expert. This was based on the ALJ's improper conclusion that the Plaintiff had the exertional capacity to perform substantially all of the requirements of light work and that Plaintiff's non-exertional impairments did not significantly limit her basic work skills.  However, as discussed above, the ALJ failed to consider and accord appropriate weight to Dr. Ice's

---

[29] See id.

[30] See id.

[31] See Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).

[32] See Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987).

[33] See id. at 1002-03.

12

opinion regarding Plaintiff's manipulative limitations. Accordingly, on remand, to the extent that the ALJ determines that the Plaintiff has severe manipulative limitations after according appropriate weight to the opinion of Dr. Ice, the ALJ should utilize the testimony of a vocational expert to determine whether the Plaintiff can perform other work which exists in the national economy.

## V. CONCLUSION

In view of the foregoing, the decision of the Commissioner is due to be **REVERSED and REMANDED** under sentence four of 42 U.S.C. § 405(g) for an Administrative Law Judge to: (1) properly evaluate the opinion of Dr. Ice with regard to Plaintiff's manipulative limitations and accord the opinion appropriate weight in accordance with the law of the Eleventh Circuit; (2) if appropriate, after according due weight to the opinion of Dr. Ice, obtain the testimony of a vocational expert to determine whether Plaintiff can perform other work which exists in the national economy; and (3) conduct any additional proceedings the Commissioner deems appropriate. The Clerk is directed to enter final judgment in favor of the Plaintiff consistent with this Order and to close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on July 21, 2006.

GARY R. JONES
United States Magistrate Judge

Copies to:
All Counsel